**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD H. BLAISDELL,
         *Plaintiff-Appellant*,

v.

C. FRAPPIEA,
         *Defendant-Appellee.*

No. 10-16845

D.C. No.
2:08-cv-01462-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
April 16, 2013—San Francisco, California

Filed September 10, 2013

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain,
and N. Randy Smith, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed the district court's summary judgment and held that an inmate did not engage in constitutionally protected activity when he served a prison official with a summons and complaint on another inmate's behalf.

Plaintiff alleged that a prison official retaliated against him by issuing him a disciplinary report after he attempted to serve her with a federal summons and complaint on behalf of another inmate. The panel first held that the district court did not err by determining that plaintiff waived his claim that his prior litigation activity against the prison triggered retaliation given his acknowledgment, in his own motion for summary judgment, that the disciplinary report was not issued because of his other litigation activities.

The panel held that the access-to-court doctrine did not provide plaintiff with constitutional protection. The panel further held that because of the general incompatibility between prison and free association, and because there was no evidence of expressive association, the First Amendment did not protect plaintiff's attempted service of process on a prison official.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Dawn Sestito, O'Melveny & Myers LLP, Los Angeles, CA, argued the cause and filed the briefs for the plaintiff-appellant. Mica Doctoroff, UCLA School of Law Ninth Circuit Clinic, Los Angeles, CA, also argued the cause for the plaintiff-appellant. With them on the briefs was Katharine S. Mercer, O'Melveny & Myers LLP, Los Angeles, CA.

Nicholas D. Acedo, Struck Wieneke & Love, P.L.C., Chandler, Arizona, argued the cause and filed a supplemental brief for the defendant-appellee. With him on the brief was Daniel P. Struck, Struck Wieneke & Love, P.L.C, Chandler, Arizona. Jaleh Najafi, Jones, Skelton & Hochuli, P.L.C, Phoenix, Arizona, filed the original brief for the defendant-appellant. With him on the brief were Eileen Dennis GilBride, Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona, and Daniel P. Struck, Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether an inmate engaged in constitutionally protected activity when he served a prison official with a summons and complaint on another inmate's behalf.

I

A

The State of Hawaii contracts with the Corrections
Corporation of America ("CCA") to house some of its
prisoners within the Saguaro Correctional Center, a privately
operated prison in Eloy, Arizona.[1]  Richard Blaisdell is one of
those inmates.  On April 23, 2008, Blaisdell visited Christina
Frappiea—the prison's Classification Supervisor—to ask her
to notarize a document for a new lawsuit he planned to file
against the prison.[2]  This was not Blaisdell's first attempt at
litigation.  He had filed at least three lawsuits against the
prison and its officers since 2007.  Frappiea notarized the
document.

As soon as Frappiea had finished, Blaisdell announced
that she had been "served" and handed her a summons and
complaint in a federal civil Racketeer Influenced and Corrupt
Organizations Act ("RICO") suit prepared by another
prisoner: Anthony Gouveia.  Blaisdell had agreed to serve
process as a favor to Gouveia and was not a party to his
lawsuit.  The suit against Frappiea concerned her apparent
unwillingness to notarize a contract for Gouveia which

---

[1] Because Blaisdell's claim regarding retaliation was not conclusively
resolved until summary judgment, *see infra* Part I.B., we "draw all
reasonable inferences supported by the evidence in favor of [Blaisdell as]
the non-moving party."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d
1054, 1061 (9th Cir. 2002).

[2] The classification supervisor's job is to make recommendations about
inmate placement so that prisoners are "assigned to the appropriate job,
housing and rehabilitative programs."  The record is silent about whether
notarizing court documents was part of Frappiea's official duties.

pertained to a lawsuit he had already filed in Mississippi federal district court. After looking at the document, Frappiea reportedly said: "Oh. Well, you can't serve that. You're a state prisoner." Blaisdell claims he replied by stating: "[T]his is not a state suit and I have every legal right in the world to serve this to you. I am over 18, and I'm not a party to the suit. And it's not breaking any laws or any rules or anything."

Following this exchange of words, Frappiea prepared a disciplinary report charging Blaisdell with Conspiracy, Failure to Follow Rules, and "Violation of Federal, State or Local Laws." Under the prison rules inmates are not permitted to possess another inmate's property, including his legal paperwork, without permission. The "Conspiracy" was Blaisdell's agreement to possess Gouveia's summons and complaint. As for the laws transgressed, Frappiea's disciplinary report references Arizona statutes that spell out the requirements to act as a process server. Frappiea later characterized Blaisdell's legal violation as a failure to comply with the screening provisions of the Prison Litigation Reform Act ("PLRA") before attempting service. *See* 28 U.S.C. § 1915A.[3] A CCA hearing officer found Blaisdell guilty on all three counts and sentenced him to sixty days of administrative segregation.

B

Proceeding pro se, Blaisdell initiated the instant litigation in Arizona Superior Court. The case was removed to federal

---

[3] Frappiea has no formal legal education and acknowledged that her characterization of Blaisdell's legal violation was a "good faith," although potentially inaccurate, interpretation of the PLRA.

district court where Blaisdell subsequently filed an amended pro se complaint under 42 U.S.C. § 1983 containing four counts. Count One claimed that his discipline in connection with the events of April 23 had been unconstitutional retaliation. Counts Two, Three, and Four asserted violations of the Due Process Clause, Arizona state law, and the federal Freedom of Information Act. He sought $10,000 in compensatory and punitive damages.

Pursuant to the PLRA, 42 U.S.C. § 1997e(c), the district court sua sponte screened the complaint, dismissing Counts Two, Three, and Four. During its screening, the district court perceived two distinct assertions within Count One. First, the court identified an allegation of retaliation by Frappiea for Blaisdell's attempt to serve Gouveia's lawsuit. Second, the court identified a possible assertion that Frappiea had prepared the disciplinary charge "to get even" with Blaisdell for his own prior lawsuits against CCA and its officers. The court's screening order, while expressing the view that Blaisdell's service of process was not an actionable basis for a retaliation claim, did not definitively screen that allegation. Instead, the order simply directed Frappiea to file an answer as to Count One.

Following discovery, both sides moved for summary judgment.[4] Frappiea argued in her motion that (1) Blaisdell's "actions as a process server [did] not constitute protected conduct" under the Constitution and (2) there was no causal "nexus between the disciplinary report and [Blaisdell's] litigation activity." The district court agreed that Blaisdell's service of process was not constitutionally protected. As for Blaisdell's own litigation activity, the court observed that, in

---

[4] Blaisdell's cross motion for summary judgment was denied.

responding to Frappiea's summary judgment briefing, Blaisdell had disclaimed a claim for retaliation on that basis. The court concluded that "[f]or this reason alone," any such theory of retaliation necessarily failed.

Blaisdell timely appealed from the order granting summary judgment to Frappiea and received court-appointed counsel.

## II

Blaisdell first argues that the district court erred in determining that he waived the claim that his prior litigation activity against the prison triggered retaliation.

Courts in this circuit have an obligation to give a liberal construction to the filings of pro se litigants, especially when they are civil rights claims by inmates. *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010); *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc). This rule relieves pro se litigants from the strict application of procedural rules and demands that courts not hold missing or inaccurate legal terminology or muddled draftsmanship against them. *See, e.g.*, *Agyeman v. I.N.S.*, 296 F.3d 871, 877 (9th Cir. 2002) ("Albeit inartfully, Aygeman raised pro se his due process claims . . . . [notwithstanding that] he did not use the specific phrase 'due process violation'. . . .'").

In this case, Blaisdell wrote in his summary judgment briefing that "[t]he issue in this case *is not* whether Frappiea wrote a false D.R. [disciplinary report] because of plaintiff's multiple lawsuits, it is because plaintiff legally served Frappiea with a federal summons and complaint naming her as a defendant in a Mississippi lawsuit." (emphasis in

original).  Through counsel, Blaisdell now argues that our decision in *Bretz* and the rule of liberal construction compel us to ignore his statement.

In *Bretz*, we construed a pro se claim "drafted in terms of § 1983" as arising instead under section 1985—a related civil-rights provision.  773 F.2d at 1027 n.1.  Blaisdell is not asking us to identify which legal terminology describes his cause of action; instead, he is asking us to take up on appeal a claim which he clearly told the district court he was not bringing.  We decline to do so.  *See Zixiang Li v. Kerry*, 710 F.3d 995, 1000 n.4 (9th Cir. 2013) ("[A] party waives an argument by failing to make it before the district court . . . .") (quoting *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) (alterations and omission in original)).

Without resort to Orwellian "Newspeak," liberal construction cannot turn Blaisdell's explanation about what his "case *is not*" into a description about what his case *is*.  In part, we credit his disavowal because it conforms with how he described his claim at other times during the litigation.  He used a form complaint designed to aid prisoners proceeding pro se.  When the form complaint prompted him to state the right violated, Blaisdell wrote: "Retaliation against the plaintiff for exercising his right to serve Federal Summons and Complaint on Frappiea."[5]  Then, in his own motion for summary judgment Blaisdell argued that "Frappiea wrote a disciplinary report on plaintiff as a result of [p]laintiff's attempt to serve [d]efendant with a valid lawful federal

---

[5] It is also salient that a claim based on Blaisdell's own litigation would never have been recognized were it not for the district court's liberal construction during screening.

summons and complaint" and stated that he was "entitled to perform the only act he did and that was to serve Frappiea."

Blaisdell's "acknowledg[ment] that the disciplinary report was not issued because of his other litigation activities" compels the conclusion that Frappiea is entitled to summary judgment on the retaliation claim to the extent it is based on prior lawsuits.

## III

Blaisdell's remaining claim for retaliation therefore hinges on whether he engaged in "protected conduct" when he served process on another inmate's behalf. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).

Resolving this question requires us to wade into doctrinal waters not often explored in detail by courts. Although commonly referred to as claims for "First Amendment retaliation," *id.*, such actions need not be tethered to the speech or associational freedoms secured by that Bill of Rights provision.[6] Instead—as an aspect of the unconstitutional conditions doctrine—a claim for retaliation can be based upon the theory that the government imposed a burden on the plaintiff, more generally, "because he exercise[d] a constitutional right." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 545 (1983); *see also Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (situating several cases alleging retaliation for

---

[6] The First Amendment provides that "Congress shall make no law . . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

protected speech amidst the "modern unconstitutional conditions doctrine" (internal quotation marks omitted)).[7] Blaisdell directs us to two possible sources of constitutional protection for his effort to serve process for his fellow inmate.

A

Blaisdell first points to a "prisoner's right of meaningful access to the courts." *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001). In the context of prisoners' rights, the Supreme Court chiefly has located the access-to-courts doctrine in the Constitution's Due Process and Equal Protection Clauses. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 367 (1996) (Thomas, J., concurring) (observing that over the decades the Court has characterized the right "as a 'consequence' of due process, as an 'aspect' of equal protection, or as an 'equal protection guarantee'" (internal citations omitted)). At other times, the Court has described the doctrine as part of every citizen's First Amendment right to petition the government. *See Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[P]risoners retain the constitutional right to petition the government for the redress of grievances . . . ."); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508,

---

[7] Perhaps not any constitutional right will suffice, however. According to one scholar, the unconstitutional conditions doctrine only safeguards "those rights that depend on some sort of exercise of autonomous choice by the rightholder, such as individual rights to speech, exercise of religion or privacy, corporate rights to do interstate business or invoke federal diversity jurisdiction, or state rights to self-government." Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1426 (1989).

510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition.").**[8]**

Blaisdell argues that two access-to-courts principles cover his conduct: (1) a right to pursue "litigation-related activities" and (2) the right of legal assistance between inmates.

1

Prisoners have the "right[] to litigate without active *interference*," *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), a guarantee that exists so prisoners have a "viable mechanism to remedy prison injustices." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). The heart of the anti-interference right is "the presentation of constitutional, civil rights and habeas corpus claims," *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004).**[9]** But, by virtue of their "broader right to petition the government for a redress of [their] grievances under the First Amendment," *Bradley*, 64 F.3d at 1279, prisoners must also have opportunities to pursue certain other types of civil litigation. *See, e.g.*, *Snyder*, 380 F.3d at 291; *Straub v. Monge*, 815 F.2d 1467, 1470 (11th Cir. 1987); *Jackson v. Procunier*, 789 F.2d 307, 311 (5th Cir. 1986).

---

**[8]** The exercise of rights while in prison, though, is cabined. *See Turner*, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").

**[9]** The access-to-courts right originated with direct appeals from convictions and habeas corpus and then was extended "only slightly, to 'civil rights actions'—*i.e.*, actions under 42 U.S.C. § 1983 to vindicate 'basic constitutional rights.'" *Lewis*, 518 U.S. at 354.

The exact nature of Gouveia's lawsuit is unknown. According to Blaisdell, it was "was a personal suit and had nothing to do with the Saguaro Prison." We will look past this statement, however, since the complaint which Blaisdell sought to serve did concern a perceived injustice at Saguaro: Frappiea's alleged refusal to notarize a contract for Gouveia in connection with his underlying civil action. Therefore, we assume for the sake of argument that Gouveia's claim against Frappiea is the type of civil suit covered by the First Amendment's right to petition.

Yet, the Supreme Court has cautioned that despite some past imprecision in its articulation of the protection, access-to-courts rights do not exist in an "abstract, freestanding" form. *Lewis*, 518 U.S. at 351. Instead, they are tethered to principles of Article III standing. *See id.* (remarking that "actual injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases").[10] For there to be a judicially cognizable injury, "the party before [the court] must seek a remedy *for a personal* and tangible harm." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (emphasis added); *see also New York v. Ferber*, 458 U.S. 747, 767 (1982) (describing "the personal nature of constitutional rights" as a "cardinal principle[] of our constitutional order"). Thus, while Gouveia and Blaisdell each have an access-to-courts right to file litigation from prison, they cannot

---

[10] This reflects the fact that in our system of separated powers "it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis*, 518 U.S. at 349.

vicariously assert that protection on each other's behalf.[11] And because Blaisdell has no share in Gouveia's "right to be free from interference," this aspect of the access-to-courts doctrine cannot support his action. *Silva*, 658 F.3d at 1103.

2

Blaisdell next claims that Frappiea's disciplinary report was issued to retaliate against him for providing affirmative legal assistance to his fellow inmate. *See Johnson v. Avery*, 393 U.S. 483, 490 (1969). "We have traditionally differentiated between two types of access-to-court claims: those involving prisoners' right to affirmative *assistance* and those involving prisoners' rights to litigate without active *interference*." *Silva*, 658 F.3d at 1102. A close inspection of *Johnson* and its progeny illustrates that, as with the access doctrine already explored, Blaisdell misconceives the true nature of the right to assistance.

Constitutional doctrine requires that inmates receive affirmative assistance in the "preparation and filing" of certain legal pleadings. *Silva*, 658 F.3d at 1102 (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). However, the Constitution does not specify the form such assistance must take. In *Johnson*, the Tennessee prison system had a regulation barring inmates from advising or assisting each

---

[11] Because of loose language in access-to-courts precedents before *Lewis* this issue had divided the lower courts. *Compare Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986) ("In a non-class-action context a prisoner has no standing to litigate another prisoner's claim of denial of access to the courts."), *with Rhodes v. Robinson*, 612 F.2d 766, 769 (3d Cir. 1979) (reading prior Supreme Court caselaw on access to courts as "disregard[ing] the rule against Jus tertii, the vicarious assertion of rights").

other about legal matters. 393 U.S. at 485. The Court invalidated that rule—not because prisoners have a constitutional right to "the assistance of fellow inmates"—but because Tennessee failed to provide any other mechanism for helping inmates who were incapable of preparing legal papers themselves. *See id.* (explaining that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce [the] regulation"); *Smith v. Maschner*, 899 F.2d 940, 950 (10th Cir. 1990) ("Prison inmates do not possess the right to a particular prisoner's help in preparing their legal materials, so long as prison officials make other assistance available."); *Kunzelman v. Thompson*, 799 F.2d 1172, 1179 (7th Cir. 1986) (holding that the "right to receive assistance from other prisoners is conditioned upon a showing that the inmates in question did not have adequate access to the court without the help of an inmate writ-writer").

Confronted with arguments akin to Blaisdell's in the years since *Johnson*, the Supreme Court has made the contingent nature of the protection for legal assistance explicit. *See Shaw*, 532 U.S. at 231 n.3 ("Under our right-of-access precedents, inmates have a right to receive legal advice from other inmates only when it is a necessary means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." (quoting *Lewis*, 518 U.S. at 350–51 (internal quotation marks omitted)). CCA's Corporate and Facilities Policy provides for a law library and for contract attorneys or paralegals to help inmates prepare motions to proceed *in forma pauperis*, motions for appointment of counsel, habeas petitions, and § 1983 suits. Blaisdell does not challenge either the sufficiency or the enforcement of that access-to-courts policy.

He also acknowledges that the federal rules furnished Gouveia with potential ways to effectuate service.[12] Moreover, it is far from clear that "the right to provide legal advice follows from a right to receive legal advice," *Shaw*, 531 U.S. at 231 n.3, a crucial leap were Blaisdell to have standing to claim the disciplinary charge impinged on the exercise of *his* rights. *Cf. Lewis*, 518 U.S. at 351–52.

For all of these reasons, Blaisdell's decision to serve process on behalf of Gouveia cannot be grounded on the access-to-court doctrine.

## B

As an alternative vehicle for constitutional protection, Blaisdell invokes the freedom of "association for the advancement of beliefs and ideas." *NAACP v. Button*, 371 U.S. 415, 430 (1963).[13]

---

[12] Rule 4 provides that at a "plaintiff's request, the court may order that service be made by a United States marshal or deputy marshal or by a person specially appointed by the court. The court must so order if the plaintiff is authorized to proceed in forma pauperis under 28 U.S.C. § 1915." Fed. R. Civ. P. 4(c). *See generally Laurence v. A.T. Wall*, 551 F.3d 92, 93–94 (1st Cir. 2008). The fact that Gouveia paid the filing fee in lieu of seeking *in forma pauperis* designation does not automatically give him an access-to-courts claim. At the very least, there would need to be evidence that the court refused his request for service as well as evidence that the prison furnished no alternative mechanism for inmate service. Blaisdell has offered no such evidence.

[13] Not expressly enumerated, this freedom is a consequence of the First Amendment's textual guarantees. *See Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative

Blaisdell cites *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir. 1985) as support for the proposition that he has a viable associational claim. In *Rizzo*, we held that "a 'jailhouse lawyer' assisting other inmates with habeas petitions and other federal actions" was engaging in expressive association under the First Amendment. 778 F.2d at 529. Rizzo provided his legal assistance during a prison-vocational course; thus, we held that he could viably allege that his forced transfer out of the course had been in retaliation for his exercise of the constitutional right to associate. Blaisdell's own evidence, however, shows that he does *not* function as a jailhouse lawyer, or anything approaching it. In his statement of facts in support of summary judgment, he wrote: "All of the points on accusing me of helping other inmates at Saguaro are fictitious and false because I have not helped any other [inmates] with their lawsuits at Saguaro."[14] Blaisdell further represented having "had nothing to do with the drafting or filing of Gouveia's lawsuit." Because Blaisdell does not engage in the kind of activity which *Rizzo* held was protected, that case is not controlling here.

In effect, Blaisdell encourages us to extend *Rizzo* and to hold that service of process, divorced from substantive legal assistance, qualifies as First Amendment association. Two

---

freedom to engage in group effort toward those ends were not also guaranteed.").

[14] The portion of the record he cited in his appellate brief, ostensibly as evidence that he offers legal assistance, does not put this representation at issue. There, he discusses a disciplinary action which "accused [him] of attempting to encourage Washington inmates to file lawsuits against CCA for violation of their civil rights." Blaisdell testified that while he might have offhandedly stated "Well, sue them," he could not "even remember the incident."

doctrinal developments since 1985 convince us that it does not.

First, the Court has clarified that associational rights only extend to groups engaged in expressive activities. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Villegas v. City of Gilroy*, 484 F.3d 1136, 1141 (9th Cir. 2007).[15]   In *Dale*, the Boy Scouts qualified as expressive because its "general mission" was inculcating members with a set of values "both expressly and by example." 530 U.S. at 649–50. Similarly, fraternal and civic associations usually can invoke the freedom of association. *See, e.g.*, *Roberts v. United States Jaycees*, 468 U.S. 609, 612 (1984) (national men's organization devoted to "genuine Americanism and civil interest" was protected).

Unable to cite to these conventional modes of association, Blaisdell simply asserts that civil rights litigation is "a form of political expression." *Button*, 371 U.S. at 429.  In *Button*, the NAACP had associational rights because it worked "to vindicate the legal rights of members of the American Negro community, [and] at the same time and perhaps more importantly, ma[de] possible the distinctive contribution of a minority group to the ideas and beliefs of our society." 371 U.S. at 431.  Such litigation was deemed political expression and thus protected "political association." *Id.*   When the Court held that the ACLU's litigation also was protected, it did so based on the ACLU's "extensive educational and lobbying activities" and involvement in public-interest cases ranging from "political dissent, juvenile rights, prisoners'

---

[15] In *Villegas*, we cabined a 1984 precedent that had declared that the Hells Angels' motorcycle club had associational rights without analyzing this doctrinal requirement. *Id.* at 1141 n. 10.

rights, military law, amnesty, and privacy." *In re Primus*, 436 U.S. 412, 427–28 (1978).

While inmates engaged in collective civil rights litigation conceivably could claim to be expressively associating,[16] the same cannot be said for the one-time service of process at issue here. Service of process has no inherently expressive dimension. *Cf. Villegas*, 484 F.3d at 1141 ("act of wearing . . . vests adorned with a common insignia simply does not amount to the sort of expressive conduct protected by the First Amendment"). Instead, it merely is a procedural mechanism for announcing that legal proceedings have begun.

A second reason not to extend *Rizzo* is that its holding is difficult to square with the Supreme Court's subsequent teachings on prisoners' rights. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (cautiously applying *Rizzo* in light of later admonitions). As a general matter, the Court has instructed that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). More specifically, the Court overruled a decision of ours which—relying on *Rizzo*—held that an inmate law clerk had heightened First Amendment protection because he was a purveyor of legal assistance. *See Murphy v. Shaw* 195 F.3d 1121, 1124–25 (9th Cir. 1999),

---

[16] As a three-judge panel, we respect *Rizzo* as binding despite some dissatisfaction with its reasoning. The Tenth Circuit authority that *Rizzo* regarded as persuasive, strikes us as wrongly decided. *See Owens v. Rush*, 654 F.2d 1370, 1379 (10th Cir.1981) (concluding that by helping his wife with her Title VII suit and "accompan[ying] [her] to her attorney's office" a husband came "within the activities held to be protected by the First Amendment in *NAACP v. Button*"). Helping one's spouse with a single lawsuit does not transform the couple into an expressive association.

*overruled by Shaw*, 532 U.S. at 227, 230–32. Blaisdell correctly notes that *Shaw* fell short of holding that prisoners have no First Amendment rights when assisting each other with legal matters. *Shaw* concerned a more discrete issue: it held that deferential scrutiny still applies when courts assess the validity of prison regulations affecting inmate legal assistance. *See* 532 U.S. at 228. Yet, not only did the Court express skepticism about the right we declared in *Rizzo*,[17] it reminded us that: (1) "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large" and (2) "courts are particularly 'ill equipped' to deal with" issues which arise behind bars. *Shaw*, 532 U.S. at 229; *see also id.* at 228 ("Traditionally federal courts did not intervene in the internal affairs of prisons and instead 'adopted a broad hands-off attitude toward problems of prison administration.'").

Because of questions about *Rizzo*'s vitality, the general incompatibility between prison and free association, and because there is no evidence of expressive association, we conclude that the First Amendment does not protect Blaisdell's attempted service of process on Frappiea.

---

[17] The skepticism is apparent both in the unanimous majority and the concurrence. *See id.* at 231 (explaining in dicta that "even if we were to consider giving special protection to particular kinds of speech based upon content, we would not do so for speech that includes legal advice"), *id.* (remarking that "inmate law clerks are sometimes a menace to prison discipline") (internal quotation marks omitted); *id.* at 232 (Ginsburg, J., concurring) ("I agree with the Court that the Ninth Circuit erred in holding that the First Amendment secures to prisoners a freestanding right to provide legal assistance to other inmates.").

IV

As any alleged retaliation against Blaisdell was not rooted in activity safeguarded by the Constitution, the district court properly awarded summary judgment in favor of Frappiea.

**AFFIRMED.**